919 A.2d 1276

Nikos Stanford LIDDY

v.

Linda H. LAMONE, et al.

No. 71, Sept. Term, 2006.

Court of Appeals of Maryland.

March 29, 2007.

Jason W. Showmaker, Bowie (Douglas W. Thiessen, West River, on brief), for appellant.

Carmen M. Shepard (Buc & Beardsley, Washington, DC, of counsel, Dan Friedman, Baltimore, on brief), William F. Brockman, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Michael D. Berman, Asst. Atty. Gen., on brief), for appellees.

Argued before BELL, C.J., RAKER, WILNER,* CATHELL, HARRELL, BATTAGLIA, GREENE, JJ.

BELL, C.J.

This is the second of two cases involving the eligibility requirements of a candidate for the office of the Attorney General of Maryland. In *Abrams v. Lamone,* 398 Md. 146, 919 A.2d 1223 (2007), this Court considered a petition by Stephen A. Abrams ("Abrams")[1] challenging the eligibility of Thomas E. Perez ("Perez") to hold the office of the Attorney General. In *Abrams,* a case of first impression for this Court, this Court was required to interpret Article V, Section 4 of the Maryland Constitution, which provides:

"No person shall be eligible to the office of Attorney–General, who is not a citizen of this State, and a qualified voter therein, and has not resided and *practiced Law in this State for at least ten years.*" (Emphasis added).

Concluding that Perez had not met the eligibility requirements, *i.e.,* he had not been a member of the Maryland Bar for

---

* Wilner, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

1. Abrams filed his action in the Circuit Court for Anne Arundel County on July 13, 2006. In it, he sought an order declaring that Perez did not have the qualifications required for the office of the Attorney General and injunctions requiring Perez to withdraw his certificate of candidacy and prohibiting Linda H. Lamone, in her official capacity as the State Administrator of Elections, and the State Board of Elections from placing Perez's name on the ballot as a candidate for the office of the Attorney General.

the requisite period, we reversed the judgment of the Circuit Court for Anne Arundel County, 398 Md. at 150–51, 919 A.2d at 1225–26, which had ruled that Perez met the necessary qualifications to run in the 2006 Gubernatorial Primary Election.[2]

The instant challenge was brought by Nikos Stanford Liddy ("Liddy"), the appellant, against Douglas F. Gansler ("Gansler"), one of the appellees, the victor in the September 12, 2006 primary election, thus the Democratic Party's nominee for the office of the Attorney General. In addition to Gansler, the appellant also named Linda H. Lamone ("Lamone"), the State Administrator of Elections, and the State Board of Elections ("the State Board"), collectively, the appellees, as defendants. It was filed on October 20, 2006, more than three months after the Abrams suit, almost two months after this Court's Order in that case, and just 18 days prior to the November 7, 2006 general election. In the complaint, he asserted that Gansler, like Perez, was ineligible to run for the office of the Attorney General, arguing that Gansler has not "practiced Law in this State for at least ten years."

There is, however, a threshold issue which must be addressed, whether the appellant waited too long to bring this action and, thus, is barred, by the equitable doctrine of laches, from bringing it now.[3] We shall hold that this action is barred by laches.

---

**2.** This Court filed a Per Curiam Order on August 25, 2006, holding that Perez was not qualified to run for the office of the Attorney General and that his name was to be removed from the primary election ballot. The appellees sought modification of the portion of the Order that required Perez's name to be removed from the ballot because they claimed, with only 18 days remaining before the primary election, that it was impossible for them to reprogram voting machines or reorder paper ballots for absentee and provisional voters in order to prepare an entirely new ballot. This Court granted the appellees' motion and issued a modified Per Curiam Order on August 29, 2006. That Order directed the local boards of elections to post notices conspicuously in each polling location to inform voters that Perez was not a candidate for the office of the Attorney General and that any votes cast for him would not be counted.

**3.** The appellees, Lamone and the State Board, claimed, in addition, that the appellant's action is barred by § 12–202 of the Election Law Article,

## A.

As stated earlier, in order for one to run for the office of the Attorney General, one must be qualified to do so. Article V, § 4 of the Maryland Constitution prescribes those qualifications. In addition, under the current Election Law Article, *see* Maryland Code (2003, 2006 Cum.Supp.), §§ 1–101, *et seq.*, a candidate wishing to hold the office of the Attorney General must register his or her candidacy by filing, with the State Board, pursuant to § 5–301(a),[4] a certificate of candidacy, under oath.[5] On June 28, 2006, Gansler filed his certificate of candidacy, in which he certified that he is "a registered voter and a citizen of Maryland and meet[s] all other requirements for the ... office [of the Attorney General]." The State Board accepted Gansler's certificate and, pursuant to § 5–601(1)[6] of the Election Law Article, placed h is name on the ballot for the 2006 Gubernatorial Primary Election.

---

specifically § 12–202(b)(2), *see infra* note 7, at 4, the applicable statute of limitations. They argued that the action needed to have been brought within three days of the certification of the primary election results by the State Board. Because that occurred on September 26, 2006, the appellant, they submit, should have brought his action by September 29, 2006. We, however, need not address this issue, as we are disposing of the appellant's claim on the equitable theory of laches.

4. Maryland Code (2003, 2006 Cum.Supp.) § 5–301(a) of the Election Law Article provides:
   "(a) An individual may become a candidate for a public or party office only if:
   "(1) *the individual files a certificate of candidacy in accordance with this subtitle;* and _____
   "(2) the individual does not file a certificate of withdrawal under Subtitle 5 of this title." (Emphasis added).

5. *See* Maryland Code (2003, 2006 Cum.Supp.) § 5–302(a) of the Election Law Article, which provides:
   "(a) A certificate of candidacy shall be filed under oath on the prescribed form."

6. Maryland Code (2003, 2006 Cum.Supp.) § 5–601(a) of the Election Law Article provides:
   "The name of a candidate shall remain on the ballot and be submitted to the voters at a primary election if:
   "(1) the candidate has filed a certificate of candidacy in accordance with the requirements of § 5–301 of this title and has satisfied any

The Election Law Article also provides that any registered voter may seek judicial relief if he or she alleges that an "act or omission relating to an election, whether or not the election has been held, is inconsistent with th[e Election Law A]rticle or other law applicable to the elections process and may change or has changed the outcome of the election," provided that the action is filed "within the earlier of 10 days after the act or omission or the date the act or omission became known to the petitioner or 7 days after the election results are certified, unless the election was a gubernatorial primary or special primary election, in which case 3 days after the election results are certified." [7] As stated earlier, Liddy brought a challenge to Gansler's qualifications. He did so on October 20, 2006, when he sought declaratory and injunctive relief against Gansler, Lamone, and the State Board because, he

---

other requirements of this article relating to the office which the individual is a candidate, provided the candidate

"(i) has not withdrawn the candidacy in accordance with Subtitle 5 of this title;

"(ii) has not died or become disqualified, and that fact is known to the applicable board by the deadline prescribed in § 5–504(b) of this title;

"(iii) does not seek nomination by petition pursuant to the provisions of § 5–703 of this title; or

"(iv) is not a write-in candidate."

7. *See* Maryland Code (2003, 2006 Cum.Supp.) § 12–202 of the Election Law Article, which provides:

" § 12–202. *Judicial challenges*

"(a) *In general.* If no other timely and adequate remedy is provided by this article, *a registered voter may seek judicial relief from any act or omission relating to an election,* whether or not the election has been held, on the grounds that the act or omission:

"(1) is inconsistent with this article or other law applicable to the elections process; and

"(2) may change or has changed the outcome of the election.

"(b) *A registered voter may seek judicial relief under this section in the appropriate circuit court within the earlier of:*

"(1) 10 days after the act or omission or the date the act or omission became known to the petitioner; or

"(2) 7 days after the election results are certified, unless the election was a gubernatorial primary or special primary election, in which case 3 days after the election results are certified." (Emphasis added).

claimed, Gansler's legal experience did not satisfy Article V, § 4's requirement that a candidate for that office "practice[ ] Law in this State for at least ten years."

Gansler filed a Motion to Dismiss Or, In The Alternative, for Summary Judgment, contending that he met all eligibility requirements for the office. Moving to dismiss and expedite scheduling, the other appellees contended that Liddy's action was barred by limitations and by laches. In support, they alleged that their sole interest in the action was to ensure an orderly administration of the election process, the deadlines of which would be jeopardized if the action were not adjudicated expeditiously.[8]

Following a hearing at which it heard extensive testimony pertaining to the merits of Gansler's constitutional eligibility for the office of the Attorney General, the Circuit Court for Anne Arundel County denied the dispositive motions filed by the appellees and Gansler.[9] Although the Circuit Court ad-

---

**8.** A number of stipulations were placed on the record, in support of the appellees' position: that Gansler filed his certification for candidacy on June 28, 2006; the 2006 Gubernatorial Primary Election was held on September 12, 2006, and the primary election results were certified on September 26, 2006; plaintiff's Complaint was filed on October 20, 2006; on October 25, 2006, 138,043 applications for absentee ballots had been received by the State Board, of which 7,074 were from service members overseas; the deadline for the filing of such applications was October 31, 2006; 14,277 absentee ballots had already been cast and received by the State Board; 19,000 electronic voting machines had been deployed throughout the State, and 13 of the 24 election jurisdictions had completed the required testing of these units; and an upward of 1.1 million paper ballots, of more than 200 different styles, had been ordered and were in the process of being delivered to the more than 3 million registered Maryland voters.

**9.** Pertaining to the merits of the case, Liddy testified that he first became aware of Gansler's lack of qualifications for Attorney General during the week of October 16, 2006 when he was conducting some research on the Internet. There he claims to have found information on Gansler's limited practice of law in Maryland. He, in fact, testified that, apart from Gansler's service for the past eight years as State's Attorney for Montgomery County, the sites he consulted referred only to Gansler's practice in Washington, D.C. and not in Maryland. Based on this information, Liddy inferred that Gansler did not meet the constitutional ten-year practice of law requirement and decided to bring suit

dressed, in addition to laches, the issues of the applicable statute of limitations and the merits of the case, we will confine our discussion to the equitable doctrine of laches.[10]

On the issue of laches, the appellees argued that the appellant's claim was "an eleventh hour lawsuit that threaten [ed] to disrupt the entire elections machinery, to sew doubt in the minds of voters, to create voter confusion and uncertainty, and generally to defeat voters' choices." The appellees maintained "voters ought to be able to make their choice intelligently and based on the ballots that have been created and in accordance with the election law." The appellees' paramount concern was the prejudice this action would have on the electorate and its choice of Attorney General candidates. In addition, they outlined the various procedures which had already taken place, and which were in the process of taking place, and insisted that the appellant's claim was simply brought too

---

challenging Gansler's continued candidacy for the office of the Attorney General.

Gansler, on the other hand, testified to having continuously practiced law in the State since his admission to the Maryland Bar in 1989. He cited his judicial clerkship from 1989–90 and numerous *pro bono* matters he handled in the State while practicing in the District of Columbia, before becoming the State's Attorney for Montgomery County.

**10.** On the issue of the applicable statute of limitations, the Circuit Court stated that " § 12–202(b)(2) does not yet apply because the general election has not yet taken place, and consequently, the election results have not yet been certified." The court continued, stating that "[b]ecause the general election has not yet been held, the 'earlier of' the two deadlines set forth in § 12–202(b) is § 12–202(b)(1), ten days of it being known to the Plaintiff that an allegedly ineligible candidate will be running in the general election." *See* Maryland Code (2003, 2006 Cum. Supp.) § 12–202 of the Election Law Article, *supra* note 7, at 4. The court ultimately held that Liddy's claim was not barred by any applicable statute of limitations because it had "no reason to disbelieve his testimony that he recently came to the conclusion on October 16, 2006, while accessing the internet, that Mr. Gansler had only practiced law in this State for eight years."

Addressing the merits of the case, the Circuit Court found, as a factual matter, that "Mr. Gansler does possess the requisite ten (10) years of practice in Maryland making him eligible to run for the Office of the Attorney General."

close to the general election to allow any changes or alterations to be made. The process was well underway, and to grant the appellant the relief he requested, *i.e.* the removal of Gansler's name from the general election ballot, at such a late stage "would lead to an unmanageable disruption of the general election and disenfranchise thousands of voters." Conversely, the appellant argued that the constitutional issue, the interpretation of Article V, § 4, outweighed any merit found in the laches defense.

In rejecting the appellees' arguments, the Circuit Court, citing *Ross v. State Board of Elections,* 387 Md. 649, 671, 876 A.2d 692, 705 (2005), held that application of laches was inappropriate in a situation such as the case *sub judice.* It determined that Liddy was "not responsible for any inexcusable delay in the processing of his complaint [and found] it inappropriate to allow the general election to go forward without examining whether a candidate who may become this State's next Attorney General is constitutionally eligible to hold that office." The court further noted, on the issue of prejudice, that "Mr. Gansler cannot be prejudiced because if, in fact, he does not meet the eligibility requirements, he ought not to be on the ballot. The S[tate] B[oard of] E[lections] is not prejudiced because it is undisputed that at this late date, there is nothing that can be done to alter the makeup of the ballot for this election." On the other hand, the court noted that "Plaintiff [Liddy] and similarly situated voters would be prejudiced if an ineligible candidate were to remain on the ballot because of a delay in finding out about the lack of eligibility."

Although the appellant prevailed on the dispositive motions, the Circuit Court ultimately ruled in favor of Gansler and his continued candidacy for the office of the Attorney General. The appellant, pursuant to § 12–203(a) [11] of the Election Law

---

**11.** Maryland Code (2003, 2006 Cum.Supp.) § 12–203(a) of the Election Law Article provides:

"(a) *In general.* A proceeding under this subtitle shall be conducted in accordance with the Maryland Rules, except that:

Article, in response, noted an appeal to this Court and to the Court of Special Appeals. In addition, he filed, in this Court, a Petition for Writ of Certiorari, which this Court granted. *Liddy v. Lamone,* 395 Md. 420, 910 A.2d 1061 (2006). The appellees and Gansler subsequently filed a Joint Cross–Petition for Writ of Certiorari. Oral argument was heard on November 2, 2006, and, on that same day, the Court issued its Order vacating the judgment of the Circuit Court and remanding the case to that court with directions to dismiss it on the ground of laches. We now set forth the reasons for that Order.

### B.

▮▮▮▮ Laches is one of the affirmative defenses recognized and expressly listed in M d. Rule 2–323.[12] Generally, it must be pled, but it can be invoked by a court on its own initiative. *See, e.g., Ipes v. Board of Fire Comm'rs of Baltimore,* 224 Md.

---

"(1) the proceeding shall be heard and decided without a jury and as expeditiously as the circumstances require;
"(2) on the request of a party or sua sponte, the chief administrative judge of the circuit court may assign the case to a three-judge panel of circuit court judges; and
"(3) *an appeal shall be taken directly to the Court of Appeals within 5 days of the date of the decision of the circuit court.*" (Emphasis added).

12. Maryland Rule 2–323 provides, in pertinent part:

\* \* \*

"(g) *Affirmative Defenses.* Whether proceeding under section (c) or section (d) of this Rule, a party shall set forth by separate defenses: (1) accord and satisfaction, (2) merger of a claim by arbitration into an award, (3) assumption of risk, (4) collateral estoppel as a defense to a claim, (5) contributory negligence, (6) duress, (7) estoppel, (8) fraud, (9) illegality, (10) *laches,* (11) payment, (12) release, (13) res judicata, (14) statute of frauds, (15) statute of limitations, (16) ultra vires, (17) usury, (18) waiver, (19) privilege, and (20) total or partial charitable immunity.
"In addition, a party may include by separate defense any other matter constituting an avoidance or affirmative defense on legal or equitable grounds. When a party has mistakenly designated a defense as a counterclaim or a counterclaim as a defense, the court shall treat the pleading as if there had been a proper designation, if justice so requires."

180, 183, 167 A.2d 337, 339 (1961) (recognizing that laches is a proper ground for refusing to issue a writ of mandamus); *Baltimore County v. Glendale Corp.*, 219 Md. 465, 468, 150 A.2d 433, 435 (1959) (noting that, although it is essential to raise the defense of laches in the pleadings, "equity may decline relief for a stale claim after the facts are fully developed"); *Warburton v. Davis*, 123 Md. 225, 231, 91 A. 163, 165 (1914) (recognizing that a court, in a proper case and on its own motion, may refuse to grant relief to a complainant who on the final hearing appears to have been guilty of laches, although the defense was not interposed by the defendant), *citing Syester v. Brewer*, 27 Md. 288, 319 (1867).[13] This Court has held that laches "is a defense in equity against stale

---

**13.** Other states also recognize that a court, in its discretion, may invoke the doctrine of laches as a matter of law. *See, e.g., Stewart v. Bass River Sav. Bank*, 3 Mass.App.Ct. 574, 336 N.E.2d 921, 925 n. 2 (1975) ("Although not pleaded, a judge may *sua sponte* find and rule on the basis of laches where justice so requires") (emphasis added); *Becker v. Becker*, 56 Wis.2d 369, 202 N.W.2d 688, 691 (1972) (noting that the defense of laches must be pleaded in the answer as a matter of affirmative defense "unless laches appears obvious from the face of complaint"); *Rutt v. Frank*, 186 Neb. 842, 186 N.W.2d 911, 915 (1971) (asserting that facts constituting laches should normally be pleaded, but a court of equity may deny relief on the ground of laches when admissible evidence together with plaintiff's pleading shows laches); *Wallace v. Timmons*, 232 S.C. 311, 101 S.E.2d 844, 847 (1958) (stating that in a proper case, the defense of laches can be considered by a court on its own motion, even though not pleaded, since "[i]t is not necessary to set up laches in a formal manner"); *Baslego v. Kruleskie*, 162 Pa.Super. 174, 56 A.2d 377, 379 (Pa.Super.1948) (noting that where fact of laches appears in the evidence, a court may deny relief on the ground of laches in its discretion and on its own motion, though laches was not pleaded in defense). Cf. *Hansen v. Kiernan*, 159 Mont. 448, 499 P.2d 787, 792 (1972) (recognizing that a court would not consider a claim of laches which was not pleaded); *Danovitz v. Portnoy*, 399 Pa. 599, 161 A.2d 146, 148 (1960) (noting that the defense of laches which "was not raised in the pleadings nor at any time in court below" could not be considered by the appellate court); *Lincoln County v. Fischer* 216 Or. 421, 339 P.2d 1084, 1097 (1959) ("[L]aches is not available as a defense unless pleaded"); *Otero v. Sandoval*, 60 N.M. 444, 292 P.2d 319, 321 (1956) (asserting that where laches was not pleaded as an affirmative defense, it was not available); *Kramer v. Johnson*, 361 Mo. 1085, 238 S.W.2d 416, 421 (1951) (holding that where defense of laches was not pleaded, denial of equitable relief on grounds of laches was error).

claims, and is based upon grounds of sound public policy by discouraging fusty demands for the peace of society." *Ross, supra,* 387 Md. at 668, 876 A.2d at 703, *quoting Parker v. Board of Election Supervisors,* 230 Md. 126, 130, 186 A.2d 195, 197 (1962); *Buxton v. Buxton,* 363 Md. 634, 645, 770 A.2d 152, 158 (2001); *Berman v. Leckner,* 193 Md. 177, 187, 66 A.2d 392, 396 (1949); *Kaufman v. Plitt,* 191 Md. 24, 28, 59 A.2d 634, 635 (1948). In its application, "[t]here is no inflexible rule as to what constitutes, or what does not constitute, laches; hence its existence must be determined by the facts and circumstances of each case." *Ross,* 387 Md. at 669, 876 A.2d at 704, *quoting Parker,* 230 Md. at 130, 186 A.2d at 197, *citing Brashears v. Collison,* 207 Md. 339, 352, 115 A.2d 289, 295 (1955); *Bowie v. Ford,* 269 Md. 111, 122, 304 A.2d 803, 810 (1973); *Day v. Day,* 237 Md. 229, 236, 205 A.2d 798, 803 (1965).

It is, however, well settled that laches "applies when there is an unreasonable delay in the assertion of one's rights and that delay results in prejudice to the opposing party." *Frederick Road Ltd. Partnership v. Brown & Sturm,* 360 Md. 76, 117, 756 A.2d 963, 985 (2000), *citing Inlet Assoc. v. Assateague House Condominium Ass'n,* 313 Md. 413, 438–39, 545 A.2d 1296, 1309 (1988); *See Ross,* 387 Md. at 669, 876 A.2d at 704 ("[L]aches must include an unjustifiable delay and some amount of prejudice to the defendant"); *Schaeffer v. Anne Arundel County,* 338 Md. 75, 83, 656 A.2d 751, 755 (1995) ("[L]aches is an inexcusable delay, without necessary reference to duration in asserting an equitable claim") (emphasis in original); *Simpers v. Clark,* 239 Md. 395, 403, 211 A.2d 753, 757 (1965) ("[F]or the doctrine [of laches] to be applicable, there must be a showing that the delay [in the assertion of a right] worked a disadvantage to another"); *Hungerford v. Hungerford,* 223 Md. 316, 320–21, 164 A.2d 518, 521 (1960) ("Only two requisites are necessary in order to invoke the doctrine of laches. There must have been some lapse of time during which plaintiff failed to assert his rights, and the lapse must have caused some prejudice to the defendant"). Prejudice is "generally held to be any thing that places [the defendant] in a less favorable position." *Ross,* 387 Md. at 670,

876 A.2d at 704, *quoting Buxton,* 363 Md. at 646, 770 A.2d at 159; *Parker,* 230 Md. at 130, 186 A.2d at 197; *Roberto v. Catino,* 140 Md. 38, 43, 116 A. 873, 875 (1922).

Moreover, this Court has recognized that in the context of election matters, "any claim against a state electoral procedure must be expressed expeditiously," Ross, 387 Md. at 671, 876 A.2d at 705, *quoting Fulani v. Hogsett,* 917 F.2d 1028, 1031 (7th Cir.1990) (noting that "[a]s time passes, the state's interest in proceeding with the election increases in importance as resources are committed and irrevocable decisions are made"), *cert. denied* 501 U.S. 1206, 111 S.Ct. 2799, 115 L.Ed.2d 972 (1991); *Kay v. Austin,* 621 F.2d 809, 813 (6th Cir.1980), without unreasonable delay, so as to not cause prejudice to the defendant. *Fulani,* 917 F.2d at 1031. *See, e.g., MacGovern v. Connolly,* 637 F.Supp. 111, 115 (D.Mass. 1986) (stating that "in awarding or withholding relief, a court should ... endeavor to avoid a disruption of the election process which might result from requiring precipitate changes that could make unreasonable or embarrassing demands on a State in adjusting to the requirements of the court's decree"), *quoting Reynolds v. Sims,* 377 U.S. 533, 585, 84 S.Ct. 1362, 1394, 12 L.Ed.2d 506, 541 (1964); *Farnum v. Burns,* 548 F.Supp. 769, 774 (D.R.I.1982) (noting that "equitable principles may require a court *not* to interfere with the conduct of rapidly upcoming elections where the election machinery is already in gear") (emphasis added); *Barthelmes v. Morris,* 342 F.Supp. 153, 160 (D.Md.1972) (stating that although "the election process is one fraught with uncertainty[, i]t does not follow [ ] that a court should add a further element of wholly unanticipated uncertainty into the process at the eleventh hour"); *cf. Ross,* 387 Md. at 671 n. 9, 876 A.2d at 705 n. 9 (outlining instances where the application of laches in the election context may not apply).

We note that, in reviewing the Circuit Court's decision, the issue of laches, in this case, is a mixed question of fact and law. Whether the elements of laches have been established is one of fact, *see, e.g., Schmidt v. Farm Credit*

*Services* 977 F.2d 511, 516 (10th Cir.1992) (noting that whether a party's delay is unreasonable is a question for the trier of fact); *Harman v. Masoneilan International, Inc.,* 442 A.2d 487, 503 (Del.1982) (stating that a finding of unreasonable delay is a factual question); *Everett v. Bosch,* 241 Cal.App.2d 648, 50 Cal.Rptr. 813, 820 (1966) (noting that whether there has been delay amounting to laches is a fact question); *Leathers v. Stewart,* 108 Me. 96, 79 A. 16, 18 (1911) ("The circumstances in a given case which are claimed to constitute laches is, of course, a question of fact"), while the question of whether in view of the established facts, laches should be invoked, is a question of law. *See, e.g., Waddell v. Small Tube Products, Inc.,* 799 F.2d 69, 77 (3d Cir.1986) ("[T]he conclusion that a delay is 'inexcusable' comprehends both the application of a legal standard and an exercise of the trial court's sound discretion in assessing the equitable circumstances of a particular case"), *quoting Churma v. United States Steel Corp.,* 514 F.2d 589, 593 (3d Cir.1975); *Freeman v. Martin Robowash, Inc.,* 61 Tenn.App. 677, 457 S.W.2d 606 (1970) ("The question whether in view of the established facts, relief is to be denied-that is, whether, it would be inequitable or unjust to the defendant to enforce the complainants' right-is a question of law"); *Leathers,* 79 A. at 18 ("[T]he conclusion whether upon the facts it would be inequitable to enforce the right, and whether the claimant is barred by laches, involves a question of law").

Maryland Rule 8–131, providing:

"c) Action tried without a jury. When an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. *It will not set aside the judgment of the trial court on the evidence unless clearly erroneous,* and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses," (emphasis added),

governs the standard of review for questions of fact, *i.e.* whether the elements of laches have been established. In addition, this Court has held that questions of law, *i.e.* whether the facts taken together are sufficient to sustain the defense of

laches, are subject to review under the *de novo* standard. *See In re Karl H.*, 394 Md. 402, 411, 906 A.2d 898, 903 (2006); *Ehrlich v. Perez*, 394 Md. 691, 708, 908 A.2d 1220, 1230 (2006); *Renbaum v. Custom Holding, Inc.*, 386 Md. 28, 43, 871 A.2d 554, 563 (2005); *Mohan v. Norris*, 386 Md. 63, 67, 871 A.2d 575, 577 (2005); *Wholey v. Sears Roebuck*, 370 Md. 38, 48, 803 A.2d 482, 487 (2002).

With respect to the standard of review for mixed questions of fact and law, in *Bowers v. Eastern Aluminum Corp.*, on the other hand, we held that this Court must affirm the trial court's decision on mixed questions of fact and law when "we cannot say [that its findings] were clearly erroneous [,] ... [a]nd we find no error in [its] application of the law to the facts." 240 Md. 625, 214 A.2d 924 (1965). Thus, we have stated that mixed questions of fact and law are entitled to deferential review on judicial review. *See, e.g., Charles County Dept. of Social Services v. Vann*, 382 Md. 286, 296, 855 A.2d 313, 319 (2004) (noting that when an agency decision under judicial review involves a mixed question of fact and law, the reviewing court applies the same standard of review it would apply to the review of an agency factual finding); *NCR Corp. v. Comptroller of the Treasury, Income Tax Div.*, 313 Md. 118, 133–34, 544 A.2d 764, 771 (1988) (stating that a reviewing court must defer to a tax court's expertise on determinations involving mixed questions of fact and law); *Pemberton v. Montgomery County*, 275 Md. 363, 368, 340 A.2d 240, 243 (1975) (asserting that, on questions of mixed fact and law, it is not the function of the appellate court to substitute its assessment of the facts, as they relate to the issues of a particular case, for those of the administrative agency).

Where, however, an administrative agency decision is not being reviewed and, thus, the expertise of the decision-maker is not implicated, critical or germane, we have held that the *de novo* standard of review is appropriate, *see Cartnail v. State*, 359 Md. 272, 282, 753 A.2d 519, 525 (2000) ("Issues of law and mixed questions of law and fact are reviewed *de novo* "), at least with respect to application of law to facts. *See also Whiting v. State*, 389 Md. 334, 345, 885 A.2d 785, 791

(2005) ("Although we extend great deference to the hearing judge's findings of fact, we review independently the application of the law to those facts"); *Winder v. State*, 362 Md. 275, 310–11, 765 A.2d 97, 116 (2001) ("The trial court's determination of whether a confession was made voluntarily is a mixed question of law and fact. As such, we undertake a *de novo* review of the trial judge's ultimate determination on the issue of voluntariness") (internal citations omitted).[14]

The latter formulation is precisely this case. A trial court is in no better position to apply, and has no more expertise in applying, the law to facts, even those it has found, than an appellate court. *See United States v. McConney*, 728 F.2d 1195, 1201–02 (9th Cir.1984), *cert. denied* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).[15] Accordingly, where the

---

**14.** It is important to note that we do not express an opinion as to the merits of the case *sub judice*. Unlike the application of law to facts, findings of fact are entitled to substantial deference. *See Wilkes v. State*, 364 Md. 554, 569, 774 A.2d 420, 429 (2001) ("We extend great deference to the fact finding of the [trial] court and accept the facts as found by that court unless clearly erroneous"). *See also Friendly Finance Corp. v. Orbit Chrysler Plymouth Dodge Truck, Inc.*, 378 Md. 337, 342, 835 A.2d 1197, 1200 (2003) (noting that factual findings of a trial court will not be set aside unless clearly erroneous); *North River Ins. Co. v. Mayor and City Council of Baltimore*, 343 Md. 34, 88, 680 A.2d 480, 507 (1996) (Bell, J., dissenting) (stating that findings of fact made by the trial court are entitled to great deference as that court is in the best position to make such findings); Maryland Rule 8–131(c), *supra* at 14. We, thus, do not review the Circuit Court's ultimate finding that Gansler is eligible, *i.e.* he meets the constitutional requirements prescribed in Article V, § 4, to serve as the Attorney General of Maryland.

**15.** In that case, the court articulated the policy concerns that underlie standard of review jurisprudence, stating:

"Structurally, appellate courts have several advantages over trial courts in deciding questions of law. First, appellate judges are freer to concentrate on the legal questions because they are not encumbered, as are trial judges, by the vital, but time-consuming, process of hearing evidence. Second, the judgment of at least three members of an appellate panel is brought to bear on every case. It stands to reason that the collaborative, deliberative process of appellate courts reduces the risk of judicial error on questions of law. Thus, de novo review of questions of law, like clearly erroneous review of questions of fact, serves to minimize judicial error by assigning to the court best

issue is whether a party is precluded by laches from challenging an action of another party, we shall review the trial court's ultimate determination of the issue *de novo*, just as we do in similar circumstances.[16] Thus, we hold that the Circuit Court erred in not invoking the doctrine of laches as a bar to the appellant's untimely claim when it placed the determination of

---

positioned to decide the issue the primary responsibility for doing so."

In addition, on the appropriate standard of review for a lower court's application of law to facts, the court specifically enunciated:

"[T]he concerns of judicial administration will generally favor the appellate court, justifying de novo review. This is so because usually the application of law to fact will require the consideration of legal concepts and involve the exercise of judgment about the values underlying legal principles."

**16.** The cases from other jurisdictions that, focusing on the heavily factual nature of laches, apply the clearly erroneous standard of review are not necessarily to the contrary. *See, e.g., Pullman–Standard v. Swint,* 456 U.S. 273, 288–90, 102 S.Ct. 1781, 1790–91, 72 L.Ed.2d 66, L.Ed.2d 66, 79–81 (1982) (recognizing that mixed questions of fact and law that are essentially factual in nature should be reviewed under the clearly erroneous standard as opposed to the generally administered *de novo* standard); *Jarrow Formulas Inc. v. Nutrition Now, Inc.,* 304 F.3d 829, 834 (9th Cir.2002) ("[T]he district court's application of the laches factors is entitled to deference, not to be reviewed de novo"); *Lozier v. Auto Owners Ins. Co.,* 951 F.2d 251, 254 (9th Cir.1991) ("[M]ixed questions in which the applicable legal standard provides for a strictly factual test ... are reviewed for clear error"), *citing McConney,* 728 F.2d at 1203–04 (adopting a functional analysis for mixed questions of fact and law that focuses on the nature of the inquiry); *Bermuda Exp. N.V. v. M/V Litsa (Ex. Laurie U),* 872 F.2d 554, 557 (3d Cir.1989) (on length of delay and prejudice issues); *Minnesota Mining and Manufacturing Co. v. Berwick Industries, Inc.,* 532 F.2d 330, 334 (3d Cir.1976) (on prejudice issue); *Tagaropulos, S.A.v. S.S. Santa Paula ex S.S. Hans Isbrandtsen,* 502 F.2d 1171, 1173 (9th Cir.1974); *Carter–Wallace, Inc. v. Procter & Gamble Co.,* 434 F.2d 794, 803 (9th Cir.1970). *See also Piper Aircraft Corp. v. Wag–Aero, Inc.,* 741 F.2d 925, 935–41 (7th Cir.1984) (Posner, J., concurring) (providing an historical overview of equity and concluding that the proper standard of review in laches decisions is the clearly erroneous standard). *Cf. Nissan Motor Co. v. Nissan Computer Corp.,* 378 F.3d 1002, 1009 (9th Cir.2004) (reviewing the trial court's laches determination for abuse of discretion); *Eastman Kodak Co. v. Goodyear Tire & Rubber Co.,* 114 F.3d 1547, 1558 (Fed.Cir.1997) (noting that an appellate court reviews a lower court's laches determination for abuse of discretion); *Bermuda,* 872 F.2d at 557 (asserting that the lower court's balancing of the equities is reviewed for abuse of discretion, while its application of legal precepts in determining that any delay was excusable is reviewed under a plenary standard).

a candidate's eligibility ahead of the urgency of the election itself and the possible disenfranchisement of Maryland voters.

### C.

As stated earlier, "any claim against a state electoral procedure must be expressed expeditiously." *Ross,* 387 Md. at 671, 876 A.2d at 705. The reason for this is plain. As the Supreme Court of the United States stated recently in *Purcell v. Gonzalez,* —— U.S. ——, 127 S.Ct. 5, 166 L.Ed.2d 1 (2006), reversing a lower court's injunction, in an election case, enjoining operation of voter identification procedures just weeks before an election, "[a] State indisputably has a compelling interest in preserving the integrity of its election process." —— U.S. at ——, 127 S.Ct. at 7, 166 L.Ed.2d at 4, *quoting Eu v. San Francisco County Democratic Central Comm.,* 489 U.S. 214, 231, 109 S.Ct. 1013, 1024, 103 L.Ed.2d 271, 287 (1989). The Court articulated further that "[c]onfidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy." —— U.S. at ——, 127 S.Ct. at 7, 166 L.Ed.2d at 4. The *Purcell* Court, moreover, addressed the issue of the applicability of laches on an election challenge, stating:

> "[the lower court] was required to weigh, in addition to the harms attendant upon issuance or nonissuance of an injunction, considerations specific to election cases and its own institutional procedures. Court orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls. *As an election draws closer, that risk will increase."* *Id.* (Emphasis added).

The Supreme Court, ultimately, held that, "[g]iven the imminence of the election and the inadequate time to resolve the factual disputes, [its] action [ ] shall of necessity allow the election to proceed without an injunction." —— U.S. at ——, 127 S.Ct. at 8, 166 L.Ed.2d at 5. Thus, it made clear that injunctive relief may be inappropriate in an elections case if the election is too close for the State, realistically, to be able to implement the necessary changes before the election. It is such pragmatic imperatives related to the implementation of

the elections process, coupled with the statutory scheme governing the process itself, that result in the need for expedited resolutions of disputes. *See also Reynolds, supra*, 377 U.S. at 585, 84 S.Ct. at 1394, 12 L.Ed.2d at 541 (stating that "a court is entitled to and should consider the proximity of a forthcoming election and the mechanics and complexities of state election laws, and should act and rely upon general equitable principles"); *Wells v. Rockefeller*, 394 U.S. 542, 547, 89 S.Ct. 1234, 1237, 22 L.Ed.2d 535, 539–40 (1969) (finding no error when court allowed an election that was only three months away to proceed "despite its constitutional infirmities"); *Kilgarlin v. Hill*, 386 U.S. 120, 121, 87 S.Ct. 820, 821, 17 L.Ed.2d 771, 774 (1967) (affirming ruling to allow an election, "constitutionally infirm in certain respects," to proceed).

In the case *sub judice*, this Court is faced with the same quandary as the *Purcell* Court and must contemplate the "considerations specific to election cases," *i.e.* the potential harm to the appellees and, more important, to the electorate, which, we believe, the Circuit Court failed to do. The Circuit Court, citing *Ross v. State Board of Elections*, and relying more specifically on *Melendez v. O'Connor*, 654 N.W.2d 114 (Minn.2002), dismissed the appellees' laches argument, concluding that "it would be inappropriate to allow the general election to go forward without examining whether a candidate who may become this State's next Attorney General is constitutionally eligible to hold that office." We do not agree. To be sure, this Court has stated, *see Ross*, 387 Md. at 671 n. 9, 876 A.2d at 705 n. 9, that there may be instances where laches would be inapplicable, and even further, that, perhaps, a dispute concerning the eligibility requirements of a candidate to run for office should not be given a laches analysis, *id.*, the facts presented by the case *sub judice*, however, do not constitute such an instance.

In *Melendez*, the court held that a petition brought by citizens to have a candidate for state representative removed from the ballot on the grounds that he did not meet the residency requirements was not barred by laches. 654 N.W.2d at 117. The court reasoned that "regardless of wheth-

er there has been an unreasonable delay by petitioners in filing their petition, there would be no prejudice to [the candidate] or others in granting the relief ... [t]here is nothing in the record indicating that [the candidate] was prejudiced by the timing of the filing of the petition." *Id.* *Melendez* is distinguishable from the case *sub judice* for two distinct reasons.

First, the citizens' petition in *Melendez* was filed on October 2, 2002, over a month before the November 5, 2002 general election was to take place. Here, the appellant brought his challenge on October 20, 2006, only 18 days before the November 7, 2006 general election, claiming that it was proper under the statutory provisions governing the election. The case was heard October 25, 2006 in the Circuit Court and then on November 2, 2006 in this Court, leaving only 5 days remaining before the general election. The time constraints thus placed on this Court, as well as the Circuit Court, were substantially different than those of the *Melendez* Court. Moreover, notwithstanding that the appellant's filing may have been within the governing statutory provisions outlined in the Election Law Article, his failure diligently to pursue his challenge left this Court, as well as the court below, a very brief time in which to consider and decide this matter. *See Lubin v. Thomas* 213 Ariz. 496, 144 P.3d 510, 512 (2006) (noting that "merely complying with the time limits [of a state statute] for filing notice of appeal may be insufficient if the appellant does not also promptly prosecute the appeal").

Second, it is clear that the court in *Melendez* was more concerned with the prejudice to the candidate than it was with prejudice to the electorate itself. This, perhaps, can be attributed to the additional time afforded to the court in making its decision, again, over a month, and the additional time available to the State's Election Division Director of the Secretary of State to make the requisite changes to the ballot, as well as any other election processes that had already taken place.[17]

---

17. The *Melendez* court issued an order granting the petition on October 15, 2002, giving the Election Division Director three weeks to make any necessary changes.

This Court, however, was not afforded that luxury. This Court could not, without causing a substantial encumbrance to the State's entire elections process, address the merits of this case. Moreover, and more important, the harm caused by the appellant's tardy filing did not only extend to the candidate himself, but to the State Board and the millions of voters of this State.

On the issue of prejudice, the Circuit Court held:

"Mr. Gansler cannot be prejudiced because if, in fact, he does not meet the eligibility requirements, he ought not to be on the ballot. The SBE is not prejudiced because it is undisputed that at this late date, there is nothing that can be done to alter the makeup of the ballot for this election. In fact, if this Court were to determine that Mr. Gansler is not eligible to run for the office of the Attorney General, other remedies are available to preserve the integrity of the election process and to give the voters the choice of qualified candidates that they deserve."

Again, we do not agree. To begin, Gansler relied on the State Board's initial certification of his candidacy and, later, its certification of the results of the primary election, which confirmed him as the Democratic Party's nominee for the office of the Attorney General in the general election. For Gansler, the appellant's dilatory challenge was, indeed, prejudicial, as it could have been brought long before not just the general election but the primary election as well. The appellant's challenge, in fact, could have been brought at any time after Gansler's June 28, 2006 filing of his certification of candidacy.

Next, the State Board also relied upon the accuracy of the ballots for both the primary and general elections. At the time the instant case was filed, the State Board had completed extensive, and was proceeding with other, elections preparations. The State Board, more specifically, had printed ballots, received back tens of thousands of absentee ballots, and completed most of its programming and testing of electronic

voting machines.[18]   Contrary to the Circuit Court's ruling, we believe that, with just five days until the election, the State Board's inability to "alter the makeup of the ballot" was, in fact, cause for prejudice.   With insufficient time to reprogram, install, and test voting machines, and to redesign, reorder, reprint, and distribute absentee and provisional ballots, the State Board was, indeed, prejudiced, particularly since, once again, the appellant's action could have been brought long before the eve of the general election.   This Court, moreover, does not agree with the Circuit Court that the State Board, in fact, did have "other remedies" available to it, and would posit, further, that eleventh-hour, ballot-access challenges such as the one in the case *sub judice* threaten the exercise of the most fundamental right granted to Maryland citizens as members of a free society.[19]

Last, and paramount to this case, the appellant's delay prejudiced the electorate as a whole.   The relief sought by the appellant, *i.e.* the removal of Gansler's name from the ballot, or, in the alternative, signs being posted to indicate Gansler's ineligibility to voters, would have caused a great deal of uncertainty in the entire election process.   The confusion that would have resulted from such last-minute changes would

---

**18.**   *See supra* note 8, at 239, 919 A.2d at 1280.

**19.**   This Court has long recognized the importance of the elective franchise.   *See Maryland Green Party v. State Board of Elections*, 377 Md. 127, 150, 832 A.2d 214, 228 (2003) (stating that Article 7 of the Maryland Declaration of Rights "has been held to be even more protective of rights of political participation than the provisions of the federal Constitution"); *Munsell v. Hennegan*, 182 Md. 15, 22, 31 A.2d 640, 644 (1943) (holding that electors should have the fullest opportunity to vote for candidates of any political party, and any restrictions that are destructive of freedom of choice by voters will not be upheld); *Kemp v. Owens*, 76 Md. 235, 241, 24 A. 606, 608 (1892) (noting that "[t]he elective franchise is the highest right of the citizen, and the spirit of our institutions requires that every opportunity should be afforded for its fair and free exercise").   *See also* Maryland Declaration of Rights, Article 7, which states "[t]hat the right of the People to participate in the Legislature is the best security of liberty and the foundation of all free Government;  for this purpose, elections ought to be free and frequent;  and every citizen having the qualifications prescribed by the Constitution, ought to have the right to suffrage."

have, indubitably, interfered with the rights of Maryland voters, particularly those who had already cast absentee ballots, causing them to be disenfranchised and the value of their votes diluted as they would not be able to vote again. The *Lubin* Court commented on the importance of absentee voting in the context of election challenges, and, in fact, articulated a more stringent guideline for those bringing such claims. The court stated that "[t]ime is of particular importance because all disputes must be resolved before the printing of absentee ballots." 144 P.3d at 512. The court went on to say that "[u]nreasonable delay can therefore prejudice the administration of justice by compelling the court to 'steamroll through . . . delicate legal issues in order to meet' the ballot printing deadlines." *Id., quoting Mathieu v. Mahoney,* 174 Ariz. 456, 851 P.2d 81, 84 (1993); *State ex rel. Fidanque v. Paulus,* 297 Or. 711, 688 P.2d 1303, 1308 (1984).

While we recognize and respect the seriousness of the appellant's claim, we hold that the Circuit Court erred in failing to apply the equitable doctrine of laches to bar the appellant's claim, as his actions, coupled with the less favorable position in which Gansler, the State Board, and the electorate as a whole were placed, were too disruptive of the election apparatus to be consistent with the objective of an orderly election. Allowing challenges to be brought at such a late date would call into question the value and the quality of our entire elections process and would only serve as a catalyst for future challenges. Such delayed challenges go to the core of our democratic system and cannot be tolerated.

It is for the forgoing reasons that we vacated the judgment of the Circuit Court.